IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CAROL MEYERS,                    §
                                 §
                 Plaintiff,      §
                                 §  Civil Action No. 3:09-CV-1402-D
VS.                              §
                                 §
TEXAS HEALTH RESOURCES, et al., §
                                 §
                 Defendants.     §

MEMORANDUM OPINION
AND ORDER

In this ERISA action,[1] the dispositive question presented is
whether the Plan Administrator abused its discretion by denying an
ERISA plan participant's claim for separation pay.  Although the
court concludes that the Plan Administrator did not apply a legally
correct interpretation of the plan and related policy, the court
nevertheless holds that the Plan Administrator did not abuse its
discretion.  The court therefore enters judgment in favor of
defendants.

I

Plaintiff Carol Meyers ("Meyers") sues defendants Texas Health
Resources ("THR") and Harris Methodist Southwest d/b/a Harris
Methodist Southwest Hospital ("HMSH") (collectively, "Texas
Health") arising out of Texas Health's denial of her claim for
separation pay.  Texas Health employed Meyers for about 14 years as
a Staff Registered Nurse and Clinical Coordinator.  On October 17,

---

[1]Employee Retirement Income Security Act of 1974, 29 U.S.C.
§§ 1001-1461.

2008 HMSH gave Meyers 60 days' notice that her position was being
eliminated effective December 15, 2008. The letter contained a
copy of the THR Separation Pay Policy ("Policy") and highlighted
some of the requirements for separation pay eligibility, including
"the requirement to actively pursue reasonable job opportunities
during the 60-day notice period." P. App. 30.[2] Meyers eventually
tendered her resignation, on November 4, 2008, effective on
November 21, 2008.

Between the time she received the 60-day notice and when she
tendered her resignation, Meyers searched for internal job openings
via THR's computerized job search system for employees. Using the
keywords "leadership," "clinical cordinator [sic]," "clinical
coordinator," and "supervisor," she searched on ten separate days
for job openings, with no results returned. *Id.* at 60-69.

Mia Brooks ("Brooks"), a THR Career Development Center
Specialist, emailed Meyers on October 28, 2008 informing her that
she "may have an interest" in an opening at the Arlington Memorial
Hospital ("AMH"). *Id.* at 41. Brooks stated: "If you are
interested, I can help with the internal transfer process or if you
are familiar you can apply online. If you decide to apply, please
let me know so that I can work directly with the Recruiter on your
behalf." *Id.* The job posting was titled "Crd Clin Nrsg" and

_____

[2]As noted in § 3.0 of the Policy, P. App. 23, the Policy was
actually a summary description of the Texas Health Separation Pay
Plan ("Plan"), an employee welfare benefit plan governed by ERISA.

required two years' experience as a staff nurse and ACLS certification for "teleetry [sic] [i.e., telemetry] and PCU" within the first three months of employment. *Id*. at 42. Duties included serving as "intra/interdisciplinary collaborator and coordinator for quality patient care" and "direct[ing] and [managing] care on a nursing u[nit] for an individual shift." *Id*.

Meyers replied by pointing out some of the undesirable aspects of the position: it was for the third shift rather than for Meyers' usual first shift; she thought the opening was for a staff nurse position because it only required two years of experience; and she believed the position would reflect a "demotion and a downward trend in [her] health career" that would impede in her ability to apply for other jobs in the future. *Id*. at 40. Meyers did not explicitly refuse to apply for the job, however. Brooks responded by clarifying that the job opening was for a Clinical Coordinator position and by offering to discuss other job opportunities in a meeting at Meyers' convenience. Meyers did not follow up on the invitation.

After tendering her letter of resignation, Meyers no longer actively searched for job opportunities within THR's system. On November 17, 2008 she met with Robert Stansel ("Stansel"), the Director of Human Resources at HMSH. At that meeting, Stansel informed Meyers that, in order to be entitled to separation pay, she must fulfill her job search obligations under the Policy.

Meyers refused to rescind her resignation, but allegedly expressed her intention to apply for the Clinical Coordinator position at AMH.  Later that day, she sent an email stating her claim under the Policy for 50% of eligible separation pay,[3] asserting that she never received a reasonable offer of employment before her resignation, and that she never refused to interview for an open position.

On November 25, 2008 Michelle Kirby ("Kirby"), THR Senior Vice President and Chief Human Resources Officer, denied Meyers' claim for separation benefits on the ground that Meyers had not actively pursued reasonable job opportunities and had refused to apply or interview for open positions within the notice period.  Kirby noted, in particular, Meyers' refusal to apply for the Clinical Coordinator position at AMH and the fact that Meyers had not applied for any of the 28 open positions available within a 49-mile

---

[3]Employees who resign rather than waiting out the 60-day notice period are only entitled to 50% of the separation pay they would have otherwise received.  Section 5.2.3 of the Policy states, in relevant part:

> If an affected employee chooses to resign,
> with proper notice, prior to the end of the
> 60-day notice period, he/she will receive 50%
> of the Separation Pay that the employee is
> eligible for as described in this policy;
> however, he/she will not receive Pay in Lieu
> of Notice for the remainder of the 60-day
> notice period.

P. App. 25.

radius of Meyers' prior work location that matched Meyers'
qualifications and offered at least 80% of Meyers' previous base
pay as the midpoint of the position's salary range. Kirby also
informed Meyers that she could request a review of the denial from
the Plan Administrator, and advised her to "state the reasons [she]
believe[d] [her] claim ha[d] been improperly denied and any other
issues and comments, including any legal authority, [she] would
like addressed or considered" and to "submit any data, documents,
or questions or comments [she believe[d] [would] be relevant to the
benefit determination." P. App. 56. Meyers responded by letter
that she had never refused to interview for the Clinical
Coordinator position at AMH and had searched for open positions
using THR's internal database. She provided copies of emails of
search results from noreply@texashealth.org that indicated that her
search queries had yielded no hits.

Meyers appealed the denial, and Kirby denied her claim again
on the ground that Meyers had not actively sought employment,
searching only for leadership, supervisor, and clinical coordinator
positions rather than for all positions for which she would have
been qualified. Under Kirby's interpretation of the Texas Health
Separation Pay Plan ("Plan") and the Policy, Meyers was required to
seek and interview for positions for which she is qualified if the
base salary requirement was met and the new position was 49 or
fewer miles from Meyers' previous workplace, even if the shift or

type of job would not have been Meyers' preferred choice.

Meyers sued Texas Health in Texas state court, alleging state-law claims for breach of contract, fraud, detrimental reliance, and promissory estoppel. Texas Health removed the case based on ERISA preemption and moved to dismiss. The court granted the motion, holding that the state-law claims were preempted, but it granted Meyers leave to amend her complaint to allege claims under ERISA. Meyers then amended her complaint. Meyers and Texas Health both move for summary judgment.

II

The Plan and Policy expressly confer on the Plan Administrator discretionary authority in determining plan terms and eligibility. *See* P. App. 11 (Plan § 3.3) ("The Plan Administrator shall have the sole and exclusive discretionary authority and responsibility for administering, construing and interpreting the Plan and ascertaining any facts in connection with any matters arising under or in connection with this Plan unless otherwise specifically provided herein."); *id.* at 28 (Policy § 5.11). The court therefore reviews under an abuse of discretion standard the Plan Administrator's decision to deny benefits. *Vercher v. Alexander & Alexander Inc.*, 379 F.3d 222, 226 (5th Cir. 2004). The court follows a two-step analysis in determining whether the Plan Administrator abused its discretion in construing the Plan and Policy terms. First, the court determines the legally correct

- 6 -

interpretation of the Plan and Policy and whether the administrator's interpretation accords with the proper legal interpretation. *Id*. at 227 (citing *Rhorer v. Raytheon Eng'rs & Constructors, Inc.*, 181 F.3d 634, 639 (5th Cir. 1999)). If the Plan Administrator's construction is legally sound, then there is no abuse of discretion. *Id.* (citing *Rhorer*, 181 F.3d at 639-40). Second, if the court concludes that the Plan Administrator did not give the Plan and Policy the legally correct interpretation, the court determines whether the Plan Administrator's interpretation constitutes an abuse of discretion. *Id.* at 227-28 (citing *Rhorer*, 181 F.3d at 640).

III

The court considers first whether the Plan Administrator applied a legally correct interpretation of the Plan and Policy. The court conducts this inquiry according to three factors: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992) (citing *Jordan v. Cameron Iron Works, Inc.*, 900 F.2d 53, 56 (5th Cir. 1990)).

A

In determining whether the Plan Administrator has applied a legally correct interpretation of the Plan and Policy, the court

begins by analyzing the first *Wildbur* factor: whether the administrator has given the plan a uniform construction. Courts addressing this question ask whether the Plan Administrator "consistently appl[ies] the Plan to similarly situated applicants." *Fralick v. Plumbers & Pipefitters Nat'l Pension Fund*, 2010 WL 2563429, at *12 (N.D. Tex. June 22, 2010) (Fitzwater, C.J.) (citing *Stone v. UNOCAL Termination Allowance Plan*, 570 F.3d 252, 258 (5th Cir. 2009)), *aff'd*, 2011 WL 1129579 (5th Cir. Mar. 28, 2011). Neither party has presented evidence on how the Plan Administrator has applied the Plan or Policy to other applicants. Thus the first factor does not guide the court and favors neither side.

B

The second *Wildbur* factor—whether the proposed interpretation is consistent with a fair reading of the plan—also happens to be the "most important factor." *Stone*, 570 F.3d at 260.

1

In determining what constitutes a fair reading, the court interprets the Plan and Policy "'in their ordinary and popular sense as would a person of average intelligence and experience.' In other words, [the court] must interpret ERISA provisions as they are likely to be 'understood by the average plan participant, consistent with the statutory language.'" *Crowell v. Shell Oil Co.*, 541 F.3d 295, 314 (5th Cir. 2008) (quoting *Tucker v. Shreveport Transit Mgmt. Inc.*, 226 F.3d 394, 398 (5th Cir. 2000)

(bracketed material added; alteration omitted)). Courts must ensure that term language is "given its generally accepted meaning if there is one." *Chacko v. Sabre, Inc.*, 473 F.3d 604, 612 (5th Cir. 2006) (internal quotation marks omitted).

Courts employ various methods to determine the fair reading of plan terms. A term should not be interpreted in a manner that renders portions of the plan "meaningless surplusage." Nor should the interpretation conflict with other parts of the contract. *See Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 272 (5th Cir. 2004); *see also Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1520 (5th Cir. 1994). An interpretation of a plan that would lead to an "unexpected result," *see Chacko*, 473 F.3d at 612, or an "unreasonable" outcome, *see Sanders v. Rubicon Inc.*, 103 F.3d 126, 1996 WL 731489, at *4 (5th Cir. Nov. 25, 1996) (unpublished opinion), is unlikely to constitute a fair reading. Courts may also consider whether a posited interpretation "furthers the overall plan goal[s]." *Gosselink v. Am. Tel. & Tel., Inc.*, 272 F.3d 722, 729 (5th Cir. 2001). Dictionary definitions can also prove helpful in identifying the common meaning of words in a plan document. *See Branson v. Greyhound Lines, Inc., Amalgamated Council Ret. & Disability Plan*, 1997 U.S. App. LEXIS 33989, at *31 (5th Cir. Oct. 30, 1997). And basic contract interpretation principles can be utilized to determine the meaning of a plan. *See id.* at *32 ("The Latin maxim *expressio unius est exclusio alterius*

proves instructive.").

Section 5.2.3 of the Policy and § 4.5 of the Plan determine employee eligibility for separation pay for those who choose to resign. Section 5.2.3 of the Policy provides, in pertinent part:

> If an affected employee [i.e., an employee whose position is being eliminated] chooses to resign, with proper notice, prior to the end of the 60-day notice period, he/she will receive 50% of the Separation Pay that the employee is eligible for as described in this policy; however, he/she will not receive Pay in Lieu of Notice for the remainder of the 60-day notice period[.] The employee will cease to be an active employee on his/her last day of employment[.]

Section 4.5 of the Plan similarly provides:

> Subject to Sections 4.2 and 4.3, if an Eligible Employee chooses to resign prior to the end of the Notice Period with proper notice, he will receive fifty percent (50%) of the Separation Pay that he would have otherwise been entitled but not Pay in Lieu of Notice[.]

Texas Health notes that § 5.2.3 of the Policy and § 4.5 of the Plan are subject to conditions: the Policy permits an affected employee to recover 50% of the separation pay "that the employee is eligible for as described in this policy," and the Plan requires that Separation Pay be awarded only to "Eligible Employee[s]," "[s]ubject to Sections 4.2 and 4.3" of the Plan, and only in the amount of 50% of the separation pay to which she "would have otherwise been entitled." Sections 4.2 and 4.3 provide,

- 10 -

respectively, that "[a]n Eligible Employee who during the Notice Period fails to interview for open positions with an Employer . . . will not be eligible for Separation Pay,"[4] and "[i]f during the Notice Period, an Eligible Employee should refuse or decline a Reasonable Offer from the Primary Employer . . . he will be treated as having voluntarily separated and will not . . . be eligible for Separation Pay."  P. App. 14.[5]  Together, the two sections prescribe two disqualifying actions: failure to interview and refusal of a "Reasonable Offer."[6]  The parties dispute, however,

---

[4]The Plan defines "Eligible Employee" as an "Employee of an Employer who has a Position Elimination as defined herein and who is not otherwise excluded under this Plan."  P. App. 8 (Plan § 2.1(e)).

[5]The Policy summarizes these requirements in §§ 5.2.6 and 5.2.7.  Section 5.2.6 provides: "If during the 60-day notice period, an employee should refuse or decline one reasonable offer, he/she will be treated as having voluntarily separated and will not be eligible for Separation Pay[.]"

Section 5.2.7 states:

> Employees are expected to actively pursue reasonable job opportunities within [THR] for which they are qualified in consultation with the Career Center and Recruitment[.] If during the 60 day notice period, an employee should refuse to interview for open positions with [THR] . . . he/she will not be eligible for Separation Pay[.]

[6]"Reasonable Offer" is defined as an offer of employment by THR for which the employee can meet the minimum qualifications with some additional training, where the midpoint of the salary range of the offered position is 80% or more of the employee's current base pay, and where the location of the new position is no greater than 49 miles from the current work location.  P. App. 24 (Policy § 4.6); *id.* at 9-10 (Plan § 2.1(q)).

- 11 -

whether additional conditions apply and for what period of time a resigning employee must meet these conditions.

Texas Health contends that Meyers must "actively pursue reasonable job opportunities within THR for which [she is] qualified in consultation with the Career Center and Recruitment," Ds. Resp. Br. 23—in addition to meeting the requirement not to refuse an interview or a reasonable job offer—for the full duration of the 60-day notice period.[7] It alleges that failure to "interview" must necessarily include failure to *apply* for open positions; otherwise, an employee could circumvent the Policy's stated expectation that employees will "actively pursue reasonable job opportunities" and become eligible for benefits by exerting even less effort to become employed than those who applied for positions but subsequently declined to interview. In other words, under Texas Health's view, an employee must apply for an open position within the Texas Health system if the position would fit

_____

[7]*See* P. App. 26 (Policy § 5.2.7). The Plan contains no equivalent language stating the expectation that employees should actively pursue reasonable job opportunities, but it does provide: "[d]uring [the 60-day notice] period the Eligible Employee will continue in his current position while pursuing other employment opportunities." *Id.* at 14 (Plan § 4.1). The October 17, 2008 letter, the November 25, 2008 letter, and the February 3, 2009 letter each states as a "requirement" for eligibility that Meyers must "actively pursue reasonable job opportunities" during the 60-day notice period. *Id.* at 30, 55, 104. *See also id.* at 45 (documenting Stansel's view, in an email dated November 17, 2008, that Meyers needed to conduct "an active job search in the system, e.g., submit[] applications and participat[e] in attendant interviews" in order to fulfill her obligations under the Separation Pay Policy).

within the meaning of "Reasonable Offer" under the Plan and Policy, during the entirety of the notice period.

Meyers maintains that this interpretation is contrary to the ordinary meaning of the Plan and Policy terms because the literal language of the two documents only penalizes a "failure to interview" or the refusal of a "reasonable offer." She posits that "failure to interview" means "the employee was requested to interview and refused to do so," P. Resp. 15; that because the Brooks email never extended an interview or an offer for the AMH position, she was never in the position to refuse an interview or offer, and that she remains eligible for separation pay; and that the Plan did not require that she pursue other employment opportunities during the notice period and, in any case, that she searched for jobs almost on a daily basis in Texas Health's internal database until the day she tendered her resignation.

3

The parties disagree about whether Meyers was obligated during the notice period to actively seek employment opportunities within THR and apply for openings that could lead to reasonable offers in order to be eligible for Separation Pay, or whether it was only required that she not turn down an interview or a reasonable job offer. The Plan states: "During [the notice] period the Eligible Employee will continue in his current position while pursuing other employment opportunities." P. App. 14 (Plan § 4.1). The Policy

provides: "Employees are expected to actively pursue reasonable job opportunities within THR for which they are qualified in consultation with the Career Center and Recruitment." *Id.* at 26 (Policy § 5.2.7). Although the requirement to actively pursue reasonable job opportunities is framed in terms of what employees are "expected" to do, it would be unreasonable, given the context, for an employee to assume that a failure to comply with this expectation did not have adverse consequences. The context in which these statements are found is significant: they appear at the beginning of sections that further describe what it means to actively pursue reasonable job opportunities, and they assign legal consequences to the failure to do so. For example, § 4.1 of the Plan describes what a "notice period" is under the Plan (i.e., a 60-day transition period before the date of separation), and it explains the expectations placed on the employee during that time (i.e., special additional obligations related to active job searching, in addition to normal job duties). Sections 4.2 through 4.4, which directly follow, elaborate more specifically on instances where the employee will be deemed ineligible for separation pay based on actions that do not reflect the active pursuit of employment opportunities, such as a failure to interview or a failure to accept a reasonable offer. Similarly, § 5.2.7 of the Policy begins with a statement that "[e]mployees are expected to actively pursue reasonable job opportunities within THR," and it

explains what is not considered active pursuit: refusal to interview for open positions within THR. Each of the specific requirements regarding acceptance of offers and interview opportunities is presented as a part of the overall expectation to actively pursue reasonable job opportunities. Also, because the Plan and Policy explain what sort of job opportunities count as "reasonable" by giving a definition of "reasonable offer," *see id.* at 21 (Policy § 4.6); *id.* at 9 (Plan § 2.1(q)), the average plan participant would have a clear idea of what sorts of job openings she would be expected to actively pursue.

The court concludes that an average plan participant, based on the popular, ordinary meaning of the provisions concerning the active pursuit of reasonable job opportunities, would understand that failure to actively pursue reasonable employment opportunities would affect her eligibility for separation pay. As § 1.0 of the Policy notes, the purpose of the Policy is "[t]o provide a consistent process to transition employees." *Id.* at 23 (Policy § 1.0). And as Article I of the Plan states, THR's purpose in establishing the Plan was "to provide benefits to Eligible Employees who meet certain conditions . . . *while securing another job.*" *Id.* at 7 (Plan art. I) (emphasis added). The purpose of the specific requirements to accept reasonable job offers and not to refuse to interview would be defeated if employees could receive separation pay simply by avoiding situations where opportunities to

interview or for offers could arise——that is, if the "active pursuit of employment opportunities" requirement did not exist.[8] Given the explicitly stated expectation that employees will actively pursue reasonable job opportunities during the notice period, it is highly unlikely that the Plan and Policy intend to penalize those who apply for open positions but fail to interview, but not those who fail to pursue open positions entirely. A plan participant could not reasonably have understood the Policy to permit her to avoid applying for any jobs, provided she did not literally refuse an entirely THR-initiated interview offer or job offer. *See Whittaker v. BellSouth Telecomms., Inc.*, 206 F.3d 532, 535 (5th Cir. 2000) (evaluating overarching purpose of benefit plan as part of fair reading analysis). A fair reading of the Plan and Policy requires giving effect to the expectation of active pursuit of reasonable job opportunities within THR as a condition of the receipt of separation pay.

4

The parties also disagree about the duration of the job search requirements. Meyers contends that whatever the requirements for separation pay, they ceased to apply to her once she tendered her resignation. Texas Health maintains that the requirements applied

---

[8]Meyers appears to concede that the Policy required her to take *some* action to pursue reasonable job opportunities, considering that she maintained that "[t]o 'actively pursue reasonable job opportunities' means searching the Defendants' computerized job search system." P. Reply 7.

for the full duration of the 60-day notice period, regardless of early resignation. Each party presents several structural arguments to support her or its interpretation of the Plan and Policy. The court concludes, however, that the parties' close readings of discrete provisions are often taken out of context and do not construe the Plan and Policy as it would be understood by the average plan participant. The court holds that, under a fair reading of the Plan and Policy, Meyers was required to comply with the separation pay requirements until the date of her resignation, rather than the full 60-day notice period (as Texas Health contends) or the date of her notice of resignation (as Meyers contends).

Meyers argues that the job search requirement found in § 4.1 of the Plan cannot be intended as lasting the full duration of the notice period because it states: "During this period the Eligible Employee *will* continue in his position while pursuing other employment opportunities," P. App. 14 (emphasis added), while § 4.5 provides a way for the employee to resign before the end of the notice period. Similarly, § 5.2.2 of the Policy states: "Generally, each affected employee will be given a minimum of 60 calendar days notice prior to his /her position being eliminated[.] During this period, the employee will continue in his /her current position while pursuing other employment opportunities," *id.* at 25, yet § 5.2.5 permits exceptions where management may choose to

terminate a position immediately, and §§ 5.2.3 and 5.2.4 permit employees to resign rather than continue in their current positions. In fact, the Policy explicitly provides that the 60-day notice period "generally" applies, thus acknowledging that exceptions to the rule *can* exist, such as the possibility of immediate termination or resignation. The court holds that an average plan participant would understand, given the resignation and immediate termination provisions elsewhere in the Policy, that there are exceptions to the general rule that an employee will be given 60 days' notice and expected to work and pursue employment opportunities during that time.

Meyers also maintains that § 4.5 of the Plan, which provides that the resigning employee will "receive fifty percent (50%) of the Separation Pay that he would have otherwise been entitled," should be read so that the phrase, "he would have otherwise been entitled" refers to the amount to which a person claiming full separation pay would be entitled. She contends that § 4.5 is only subject to §§ 4.2 and 4.3, which require that an employee must not fail to interview or refuse a reasonable offer, and that because she has met these requirements, she is entitled to 50% of the full separation pay.[9]  Similarly, Meyers maintains that § 5.2.7 of the

_____

[9]In Meyers' view, she was not obligated to pursue reasonable employment opportunities at any point during the notice period, in part because she maintains that § 4.1, which contains the requirement to pursue employment opportunities, does not apply to those who resign under § 4.5. The court has already addressed the

Policy, which addresses the interview requirement, only applies to employees who remain until termination, and that § 5.2.3 governs employees who elect to resign. She reasons that § 5.2.7, by specifying what an "employee" must do to be eligible for separation pay, necessarily excludes those who resign, given that § 5.2.3 (the section that addresses conditions for employees who choose to resign) provides that an employee "will cease to be an active employee on his/her last day of employment." Texas Health opposes this reasoning, relying on the literal language of the Plan and Policy that requires that all eligible employees comply with the interview and offer acceptance requirements during the 60-day notice period, with no exceptions for those who resign.

Although the court disagrees with Meyers' rationale (because she attempts to argue that she had no obligation to actively pursue employment opportunities),[10] it agrees with Meyers that a full 60-

_____

substance of this argument. Meyers was required to actively pursue reasonable job opportunities for the time she continued in her current position. A resignation under § 4.5 does not exempt her from § 4.1 before that time.

[10]Section 5.2.3 of the Policy and § 4.5 of the Plan govern resigning employees' obligations, but they do not render the requirements of § 5.2.7 of the Policy or § 4.1 of the Plan inapplicable. Section 5.2.3 of the Policy still defines separation pay for resigning employees as 50% of the separation pay that the employee is eligible for "as described in this policy," and § 4.5 of the Plan permits the resigning employee to recover 50% of only that to which she "would have otherwise been entitled." Therefore, nothing in § 5.2.3 of the Policy or § 4.5 of the Plan exempts Meyers from the ongoing requirements defined in § 4.1 of the Plan or § 5.2.7 that, for the time she continued in her current position, she was required to do so while pursuing other employment

day compliance period for those who resign is contrary to the
ordinary meaning and the full context and purpose of the Plan and
Policy.   Section 5.2.3 of the Policy, which governs benefits for
resigning employees, states:

> If an affected employee chooses to resign,
> with proper notice, prior to the end of the
> 60-day notice period, he/she will receive 50%
> of the Separation Pay that the employee is
> eligible for as described in this policy;
> however, he / she will not receive Pay in Lieu
> of Notice for the remainder of the 60-day
> notice period[.] The employee will cease to be
> an active employee on his/her last day of
> employment[.]

*Id.* at 25.   When an employee chooses to resign after giving the
requisite notice, § 5.2.3 provides that she "will receive 50% of
the Separation Pay" for which she would have been eligible.   Under
Texas Health's interpretation, this payment cannot occur until the
end of the 60-day notice period, after Texas Health can confirm
that all the requirements for separation pay have been met for a
full 60 days.   The court rejects the premise that a resigning
employee must continue to actively pursue reasonable employment
opportunities at THR throughout the 60-day notice period to receive
50% of what she would otherwise have received.   Such an
interpretation would make the resignation option a practical
nullity: Those who wished to resign early because they had found
jobs outside the Texas Health system would never receive separation

opportunities.

pay because they could not fulfill the requirements of actively pursuing reasonable job opportunities within THR, accepting reasonable job offers from THR, and not refusing to interview (since they would already have secured a job commitment elsewhere). Those who did not have other job opportunities lined up would rarely elect to resign, because they would gain nothing for forfeiting 50% of their separation pay and their remaining pay in lieu of notice. As noted in *Chacko* and *Sanders*, an interpretation of a plan that would lead to an "unexpected result" or an "unreasonable" outcome is unlikely to constitute a fair reading. *See Chacko*, 473 F.3d at 612; *Sanders*, 1996 WL 731489 at *4. An average plan participant could not have understood the Policy to require that she continue to search for jobs within THR for the full 60 days even after she had resigned from THR. Nor would she have understood that she would have to await the expiration of the same 60-day period that would apply had she not resigned in order to receive only 50% of the separation pay, when she could have gotten 100% of the separation pay *without* forfeiting pay in lieu of notice simply by not resigning. The court concludes that a fair reading of the resignation option supports accelerated payment on the day of resignation, although at the cost of forfeiting pay in lieu of notice for the balance of the 60 days and 50% of the separation pay. If payment must occur on the day of resignation (i.e., before the 60-day period has expired) in order for the

resignation option to have a function, it cannot be that a resigning employee's eligibility depends on requirements that last for all 60 days of the notice period.

Furthermore, § 5.2.3 provides that an employee who "chooses to resign, with proper notice," "will receive 50% of the Separation Pay [for which she is eligible]," but "not receive Pay in Lieu of Notice for the remainder of the 60-day notice period." The relevant point of time referenced in this sentence appears to be the date of resignation: the point at which the resigning employee no longer receives pay in lieu of notice (i.e., defined in § 4.4 as the amount of base pay that an employee would normally be paid during the notice period, *see id.* at 24), and the point after which the resigning employee is to be paid 50% of the separation pay and concomitantly assessed whether she is eligible for it. The court finds nothing in the Plan or Policy that suggests that the relevant point at which the obligations cease is the date of *notice* of resignation, rather than the date of resignation, at which point she is no longer given pay in lieu of notice and ceases to be an employee. An average plan participant would understand that separation pay is not awarded until after resignation, and that eligibility under the Policy at the time of the payment is determined based on whether she remains eligible for separation pay on the date her right to separation pay accrues. And contrary to the concerns expressed by Texas Health, an employee would not be

able to resign at the beginning of the notice period and avoid the requirements for separation pay. Under a fair reading of the Policy, she would be required to give "proper notice" of her resignation, and, until the time of her resignation, comply with all of the requirements for separation, including that she actively pursue reasonable job opportunities in consultation with the Career Center. If an employee were to resign under circumstances that left her without time to actively pursue reasonable job opportunities or to consult with the Career Center, she would be ineligible for separation pay under this reading of the Plan and Policy. Therefore, an employee could not avoid the separation pay eligibility requirements simply by resigning early.

5

Accordingly, the court concludes that, under a fair reading of the Plan and Policy, from the time Meyers was given notice that her position was being eliminated until the date of her resignation, she was only required to actively pursue reasonable job opportunities by applying for openings that could lead to a "Reasonable Offer," to accept a "Reasonable Offer," and not to refuse to interview for an open position. The Plan Administrator interpreted the Plan and Policy in a manner that did not comport with a fair reading of either; it required that Meyers meet these requirements for the entire 60-day notice period.

C

The court will not address the third factor of "unanticipated costs" because the parties have not presented arguments and factual support to guide the court in determining the extent to which various interpretations of the Plan and Policy would impose unanticipated costs on Texas Health. *See Stone*, 570 F.3d at 258 n.4 (declining to address third factor where defendant did not raise any arguments based on unanticipated costs); *White v. St. Luke's Episcopal Health Sys.*, 317 Fed. Appx. 390, 393 (5th Cir. 2009) (per curiam) (same).

The court concludes that the Plan Administrator did not apply a legally correct interpretation of the Plan and Policy.

IV

Having concluded that the Plan Administrator's interpretation of the Plan and Policy is not legally correct, the court must next address whether the interpretation constitutes an abuse of discretion.[11]

---

[11]Meyers maintains that this court is not rigidly confined to this two-step analysis. *Gosselink* states in *dicta*: "Clearly, if an administrator interprets an ERISA plan in a manner that directly contradicts the plain meaning of the plan language, the administrator has abused his discretion even if there is neither evidence of bad faith nor of a violation of any relevant administrative regulations." *Gosselink*, 272 F.3d at 727. But this is not a case in which Texas Health's interpretation goes as far as to directly *contradict* the plain meaning of the Plan language. The literal terms of the Plan and Policy leave undefined whether the requirements for separation pay eligibility apply for 60 days or for a shorter period. The legally correct interpretation described above, while a fair reading, is not plainly apparent on the face of

A

"A plan administrator abuses its discretion where the decision is not 'based on evidence, even if disputable, that clearly supports the basis for its denial.'" *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (quoting *Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 342 (5th Cir. 2002)). "A decision is arbitrary only if 'made without a rational connection between the known facts and the decision or between the found facts and the evidence.'" *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) (quoting *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 828 (5th Cir. 1996)).[12]

Under *Wildbur* the court considers three factors:

> (1) the internal consistency of the plan under the administrator's interpretation,
> (2) any relevant regulations formulated by the appropriate administrative agencies, and
> (3) the factual background of the determination and any inferences of lack of good faith.

*Wildbur*, 974 F.2d at 638.

---

the Plan language. The Plan Administrator's decision to apply the eligibility requirements for the full 60-day notice period does not directly contradict any provision in the Plan or Policy.

[12]As noted in *Anderson v. Cytec Industries, Inc.*, 619 F.3d 505, 512 (5th Cir. 2010), the "abuse of discretion" standard applied here is functionally equivalent to "arbitrary and capricious" review: "there is only a 'semantic, not a substantive difference' between the arbitrary and capricious and the abuse of discretion standards in the ERISA benefits review context." *Meditrust Fin. Servs.*, 168 F.3d 211, 214 (5th Cir. 1999) (quoting *Wildbur*, 974 F.2d at 635).

In determining whether the Plan Administrator abused its discretion, the court has also weighed the potential conflict of interest that arises from Texas Health's dual role as the entity that simultaneously funds and administers the benefits in question. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111-12 (2008) (concluding that plan administrator that both evaluates claims for benefits and pays benefits claims creates the kind of "conflict of interest" that requires weighing of the conflict as a *factor* in determining whether there is an abuse of discretion" under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).[13]

_____

[13]*Glenn*'s holding abrogates the Fifth Circuit's earlier "sliding scale" approach, where the greater the evidence of conflict on the part of the administrator, the less deferential is the court's abuse of discretion standard. *See McDonald v. Hartford Life Group Ins.* Co., 361 Fed. Appx. 599, 606 n.7 (5th Cir. 2010) (per curiam). Nevertheless, the Fifth Circuit has noted that the "factor" approach of the Supreme Court operates compatibly with the "sliding scale" approach. *See id.* (noting that old precedents remain good law to the extent that conflict of interest alters the relative weight of other factors). And *Glenn* itself acknowledges that once a conflict of interest is found, courts can still adjust for the significance or severity of the conflict in individual cases. *See Glenn*, 554 U.S. at 115. Thus this court recognizes that a conflict of interest exists because of Texas Health's dual role, in that "every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved is a dollar in [the employer's] pocket." *See Glenn*, 554 U.S. at 112 (quoting *Bruch v. Firestone Tire & Rubber Co.*, 828 F.2d 134, 144 (3d Cir. 1987)). The court declines, however, to give this conflict "considerable weight," as Meyers urges, because to support her claim of conflict, Meyers offers no more than the fact that Texas Health simultaneously paid and decided claims and that Texas Health was undergoing a reduction in force. *Cf. Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d 262, 270 n.18 (5th Cir. 2004) (declining to find presumption of conflict *ipso facto* merely because the fiduciary both insured plan and administered it); *MacLachlan v. ExxonMobil Corp.*, 350 F.3d 472, 479 n.8, 480 (5th

The court considers first whether Texas Health's interpretation, which requires the employee to fulfill separation pay eligibility requirements for the entire 60-day notice period, creates internal inconsistencies in the Plan or Policy. The court acknowledges that Texas Health's interpretation essentially eliminates a resignation option by making it attractive primarily (if not only) to those employees who find working at THR so undesirable that the benefits of resigning outweigh the detriments of forfeiting 50% of their separation pay and their remaining pay in lieu of notice. This erroneous interpretation may lead to an unlikely and unintended result, but it is internally consistent with the literal language of other provisions in the Plan and Policy. The literal language of the Plan and Policy, to the extent it specifies a time period for employees facing separation to meet the interview and job offer acceptance requirements, consistently uses the phrase "during the 60 day notice period." The court

Cir. 2003) (concluding that "[t]he mere fact that benefit claims are decided by a paid human resources administrator who works for the defendant corporation does not, without more, suffice to create an inherent conflict of interest," and noting that, otherwise, the abuse of discretion standard would become the exception rather than the rule). Although *Ellis* and *MacLachlan* predate *Glenn*, the court considers the precedent instructive under *McDonald* concerning the degree of weight given to the conflict of interest found under *Glenn*. *See Crowell*, 541 F.3d at 318 n.95 (acknowledging that, under *Glenn*, a conflict of interest exists when a plan administrator works for the defendant, but (as in *MacLachlan*) finding threat from conflict largely unsubstantiated and worth little weight).

recognizes that it has concluded in this case that requiring resigning employees to meet eligibility requirements for the full 60-day notice period is not a fair reading of the Plan and Policy given what an average plan participant would understand, since such an interpretation would lead to an unexpected result when applied to resigning employees. But there is nothing inherently inconsistent or illogical about the idea that an employee can be held to certain obligations after the employment relationship ends.[14]

C

The federal regulations that govern summary plan descriptions require any limitations or conditions that may lead to ineligibility to be explained clearly. A summary plan description "must not have the effect [of] misleading, misinforming or failing to inform participants and beneficiaries." 29 C.F.R. § 2520.102-2(b) (2010). Any "exceptions, limitations, reductions, or

---

[14]Meyers argues that Texas Health's interpretation would result in unintended consequences because it would be impossible for an employee to continue pursuing job opportunities within Texas Health after she resigns. The court disagrees. Even supposing that the employee no longer has direct access to Texas Health's internal job database, § 5.2.7 of the Policy provides that employees will search for openings "in consultation with the Career Center and Recruitment," providing a way even for those inactive employees no longer in the system to access internal job postings. In fact, the Career Development Center Specialist who worked with Meyers specifically offered to "help with the internal transfer process" and to "work directly with the Recruiter on [Meyers'] behalf," see P. App. 41, further suggesting that an employee who had resigned would still be able to apply through internal processes by coordinating her efforts with Recruitment and the Career Center.

- 28 -

restrictions of plan benefits" must be clearly noted. *Rhorer*, 181 F.3d at 643 (citing 29 C.F.R. § 2520.102-2(b) (2010)). A plan must contain "a statement clearly identifying circumstances which may result in disqualification, ineligibility, or denial . . . of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide" and a summary of such obligations. 29 C.F.R § 2520.102-3(l).

Although the court has concluded, based on how an average plan participant would understand the Plan and Policy, that a 60-day period of compliance with separation pay requirements does not apply to resigning employees, the literal language of the Plan and Policy clearly explain that an employee will be disqualified from claiming separation pay if she fails to interview for open positions or refuses a "Reasonable Offer" during the 60-day notice period, with no exceptions specified for resigning employees. Nevertheless, the Plan and Policy do not define an applicable time period for the requirement that employees "actively pursue reasonable job opportunities within THR." Because the express language of the Policy does not clearly indicate to an average plan participant that she will be required to meet all eligibility requirements for separation pay for the entire 60-day notice period, the second factor supports the conclusion that Texas Health abused its discretion in applying its proposed interpretation.

The factual background of the determination does not support any inference of bad faith.[15] Meyers maintains that Texas Health's factual determinations are not based on "concrete evidence," and specifically disputes (1) the Plan Administrator's finding that Meyers failed to pursue employment opportunities with Texas Health, (2) the Plan Administrator's conclusion that Meyers' email to Brooks constituted a refusal to interview, and (3) the Plan Administrator's evaluation of what qualifies as a reasonable job opening without inquiring further into Meyers' qualifications.[16] The court concludes that these criticisms do not suggest that Texas Health acted in bad faith.

Meyers' first two assertions challenge legal conclusions

---

[15]At this stage in the inquiry, the court may consider evidence that is not in the administrative record because the court's purpose is to review alleged deficiencies in the denial process itself rather than the internal logic of the decision. *See* *Wildbur*, 974 F.2d at 639. The court still reviews the factual determinations themselves based on the evidence before the Plan Administrator at the time of the determination.

[16]The court notes that the third factor of the abuse of discretion analysis requires evaluation of the "factual background of the determination," rather than evaluation of the "factual determinations" *per se*. *See, e.g.*, *Ellis*, 394 F.3d at 272 n.23 (addressing details of determination process, rather than factual findings themselves, during third-factor analysis); *Rhorer*, 181 F.3d at 643 (questioning nonresponsiveness of the plan administrator during determination process, rather than any particular factual conclusion). Nevertheless, because a particularly arbitrary factual determination can shed light on how the eligibility determination process was conducted, the court will address Meyers' "factual determination" challenges.

rather than factual findings. The parties do not dispute the underlying fact that led to the Plan Administrator's conclusion that Meyers failed to pursue employment opportunities and that she refused to interview: Meyers did not apply for any job openings with Texas Health. Although the Plan Administrator's interpretation of the Plan and Policy was legally incorrect in requiring resigning employees to comply with all separation pay conditions for the full 60-day notice period, the decision to deny benefits was based on evidence that, under the correct interpretation, would clearly have supported denying separation pay. Furthermore, if the Plan Administrator believed that, to remain eligible for separation pay, Meyers was obligated to apply for all types of positions for which she was qualified and that could lead to a reasonable offer within the 60-day notice period, it would be rational for the Plan Administrator also to conclude, based on the available facts, that Meyers disqualified herself from eligibility for separation pay.

The first communication of denial occurred on November 25, 2008, when Kirby responded by letter to Meyers' earlier inquiries to Stansel regarding separation pay. In this letter, Kirby informed Meyers that she would not be found eligible for separation pay and encouraged her to reconsider her resignation and look for

a job with Texas Health instead.[17] Kirby knew at the time that
Brooks had contacted Meyers within the 60-day notice period and had
directed Meyers' attention to a job opening within 49 miles of her
workplace for the same type of position as Meyers' current
position.[18] Kirby also stated this factual finding: "Our records
reflect that you have not applied for any positions." P. App. 55.
Kirby did not explain further in the letter the nature of the
information found in Texas Health's "records," but other evidence
suggests that this factual finding is reliable. Kirby would have
had some evidence from the email sent to her from Stansel that
Meyers had not applied for any jobs with Texas Health as of
November 18, 2008. A subsequent reply from Meyers dated January 9,
2009 confirmed that the records Kirby relied on were correct:
Meyers had not applied for any jobs with Texas Health, because she
admitted in the letter that all of her job searches in the internal
system resulted in zero results, and Meyers did not deny in her
version of facts that she never applied for a job with Texas Health

---

[17]At the time, Meyers' resignation had become effective, but
the 60-day notice period had not expired because the date of
termination would not occur until December 15, 2008.

[18]Kirby's knowledge of these facts can be inferred from her
letter to Meyers explaining the reasons for the denial of
Separation Pay. In the letter, Kirby stated that she had
researched Meyers' case, and she explained the sources of
information on which she relied, such as Brooks' emails (which
would have explained the nature of the job opening being referred
and Meyers' response) and the notice of position elimination letter
from Meyers' current employer (which would have informed Kirby of
Meyers' then-current workplace, position, and salary).

following receipt of notice that her position was being eliminated. Based on the facts available to Kirby at the time of the November 25, 2008 letter, her decision to deny Meyers' request for separation pay could not be classified as arbitrary. On the contrary, under Texas Health's interpretation of the Policy requirements and the facts available to Kirby at the time, a denial would have been mandatory: Meyers had not participated in a single interview, she had not applied for a single job opening that matched her qualifications and "Reasonable Offer" parameters, and she had even failed to apply for the one position for which she had specifically been invited to apply.

A second opportunity to exercise discretion occurred when Meyers sent a reply to Kirby's letter on January 9, 2009 supplementing the record with documentation of her job search attempts on the internal database and highlighting the fact that her searches returned no openings. Meyers also communicated to Kirby through her attorney on January 22, 2009, expressing her intent to sue for breach of contract. Kirby treated this series of submissions as a request for appeal, and she explained in her February 3, 2009 response that she had reviewed the January 9 letter and the January 22 letter before denying Meyers' claim for the second time. This decision was also a reasonable application of the facts available in the administrative record at the time to the Plan Administrator's interpretation of the Plan and Policy.

Even if Meyers' newly submitted search records revealed that she had put some good-faith effort into searching for open positions with Texas Health, Kirby knew from her internal investigations that (1) Brooks had personally directed Meyers to a clinical coordinator position equivalent to her current position and had corrected Meyers' mistaken understanding about whether the job would be a demotion, yet Meyers had chosen not to apply for the position; and (2) conversations with Texas Health personnel had revealed that Stansel discussed with Meyers registered nurse vacancies and the option of remaining at her current location as a registered nurse. *Id.* at 96. There was a rational connection between these factual findings and Kirby's conclusion that Meyers, in failing to apply for even the openings of which she was personally informed, had not actively pursued employment opportunities for which she was qualified that could lead to a "Reasonable Offer."

E

Meyers also challenges the factfinding process. She posits that the clinical coordinator position from Brooks' email and the registered nurse openings should not be counted as "open positions" because she was either not qualified for them or the positions paid too little to result in a "Reasonable Offer," as defined in the Plan and Policy. She maintains that Kirby failed to investigate Meyers' qualifications and the salary range of the open positions, making her conclusions arbitrary and capricious.

Meyers asserts for the first time in this court that she was not qualified for the clinical coordinator position because she was not "ACLS Certified" and did not have "PCU" experience. P. Resp. 24. But Meyers' expressed concern in the appeal record was that she was overqualified, rather than underqualified, for the clinical coordinator position: she complained to Brooks that the position "appears to be for a staff nurse" and only requires "2 years experience," while she had been a clinical coordinator "for over 10 years," and that the position would "reflect[] a demotion and a downward trend in [her] health career." P. App. 40. Kirby was never informed, even on appeal, that Meyers subjectively felt she did not have some of the qualifications described in the job posting. Furthermore, viewed objectively, the job opening specified the qualifications that were "current[ly]" required, required "within 1st 3 weeks of employment," or "required . . . within 1st 3 months of employment." The ACLS and PCU qualifications were not required until after the first three months of employment. Kirby had an objective basis to conclude from the facts available in the record that Meyers was qualified: the only "current" qualifications stated in the job posting was "Graduate of Accredited School of Nursing," "2 years as staff nurse in appropriate medical acute care setting," and "Registered Nurse in the State of Texas." There was no indication from the record that Meyers would be unwilling or unable to fulfill the other

requirements within the time frame prescribed. And in any case, Texas Health was operating under the Plan's and Policy's definitions of "Reasonable Offer," which specifically note that "some additional training may be necessary." As such, there was no need for Kirby to investigate further whether Meyers was ACLS certified because this was not a requirement for the position.

Meyers alleges based on her "experience and recollection" that the midpoint of the salary range for staff nurses is at $32.50, which is less than 80% of her rate of $42.14 per hour. *Id.* at 2. But assuming that this evidence is admissible before this court, the clinical coordinator position described in Brooks' email was the same type of position that Meyers occupied before her resignation (as were several of the positions in the list of 28 open positions). And Meyers does not dispute that the midpoint of the salary range of these positions would not be below 80% of her base pay. On the administrative record, her only objection to pay was based on her misunderstanding that the job posting in Brooks' email was for a staff nurse position and her belief that *staff nurse* positions would reflect a "drop down in position and pay." *Id.* at 57.[19]

---

[19]According to Stansel and Kirby, Meyers' explanation for her refusal to apply for the position emphasized the fact that it was for the third shift rather than for pay that she considered inadequate. The court qualifies the weight of this statement, noting that, because of the potential conflict of interest in Texas Health as administrator and funder, Stansel may have focused on some of Meyers' reasons over others. But this observation is

The evidence is sufficient to show that there was a rational connection between known facts on the record and the Plan Administrator's decision to deny benefits. Even if the court ignores the registered nurse positions that Texas Health offered at Meyers' then-current location and the 28 open positions for which she did not apply because she was unaware of them, there is uncontroverted evidence that Brooks presented to Meyers an opportunity to apply for an open position as a clinical coordinator within 49 miles of her workplace, for which Meyers was qualified, and that Meyers declined to apply for the job despite being specifically invited to do so and being told that the job opening was for a clinical coordinator position. The Plan Administrator did not abuse its discretion in deciding, based on this evidence,

_____

corroborated by the fact that, in Meyers' own words to Brooks, she expressed concerns about how a demotion or downward trend would appear when applying for future jobs, rather than the fact that she would be paid less *per se*. She wrote:

> If I accept a position that reflects a demotion and a downward trend in my health career, it would lead to serious questions in the future with regards to applying for other jobs[, s]ince most individuals reviewing my job history would wonder what caused this drop down in position and pay.

P. App. 40. But such sacrifices in pay are fully anticipated in the very nature of the Plan and Policy as a contingency plan when positions are eliminated. The Plan and Policy specify that an offer for a position that pays at least 80% of the previous position's base pay will be deemed a "Reasonable Offer" with respect to pay. As such, Kirby had a basis to conclude that Meyers' objections to the position did not excuse her refusal to apply for the clinical coordinator position.

that Meyers did not actively pursue reasonable opportunities for employment in that she did not apply for a job opening that could have led to a reasonable offer despite knowing about its existence. There is record evidence that clearly supports Kirby's denial based on her interpretation of the Plan's and Policy's requirements. Furthermore, such a rational application of supportable, if disputed, facts to a good-faith interpretation does not support an inference of bad faith, even though Meyers would have preferred a more thorough explanation and documentation of Kirby's investigation. And Meyers raises no other arguments of bad faith or other deficiency in the factfinding or interpretive process. Although Meyers mentions conflict of interest briefly in her arguments, the conflicts presented are no more than those implicated in typical self-administered plans, and it does not change the court's assessment of the factual findings, which are largely undisputed or are verifiable based on the administrative record.

F

After balancing the factors, the court concludes that Texas Health did not abuse its discretion in interpreting the Plan and Policy to require Meyers to actively pursue reasonable job opportunities (by applying for positions that could lead to a "Reasonable Offer"), to accept reasonable job offers, and not to refuse interviews for the entirety of the 60-day notice period.

- 38 -

The Plan Administrator's decision was based on evidence in the administrative record that Meyers did not apply for an opening that could have led to a reasonable job offer, despite having actual knowledge of the position prior to her resignation and the expiration of the 60-day notice period, and despite being expressly offered assistance with the internal transfer process.

*       *       *

For the reasons explained, the court holds that Meyers is not entitled to relief, and it dismisses this action with prejudice by judgment filed today.

**SO ORDERED.**

April 4, 2011.

SIDNEY A. FITZWATER
CHIEF JUDGE